307 P.2d 908

**STATE of Arizona, Appellant,**

v.

**The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a corporation, Appellee.**

**No. 6158.**

Supreme Court of Arizona.

Feb. 28, 1957.

Robert Morrison, Atty. Gen., and H. B. Daniels, Asst. Atty. Gen., for appellant.

Fennemore, Craig, Allen & McClennen, Phoenix, for appellee.

LA PRADE, Justice.

This action was initiated against the defendant-appellee, Atchison, Topeka and Santa Fe Railway Company, by the State of Arizona, appellant, to assess the statutory penalties based upon alleged violations of a provision of the so-called "full crew law", section 69–121, A.C.A.1939 (section 40–881, subd. A, A.R.S.1956). In substance the State alleged that the company, on two separate occasions, operated a locomotive with its accompanying tender between Williams and Ash Fork, Arizona, with engineer and fireman but without a conductor or flagman, in violation of the above section. The State also alleged that in each instance the locomotive in question was not within the statutory exception in that it "was not then and there a helper locomotive going or returning a distance of twenty-five miles". At the close of the case the court granted appellee's motion for judgment, and from the judg-

ment entered thereon this appeal was taken. The first paragraph of the statute alleged to have been violated reads as follows:

"69–121. Train crews—Failure to use full crews—Penalty.—A single locomotive, or a single locomotive with its accompanying tender, when operated outside of the yard limits, shall be equipped with, and shall carry, a crew consisting of not less than one (1) engineer, one (1) fireman, and one (1) conductor or flagman; provided, however, that this section shall not apply to helper locomotives going or returning a distance of twenty-five (25) miles."

The essential facts before the trial court were as follows: on August 10, 1949, and on July 5, 1950, the company's locomotives No. 3244 and No. 3401 moved from Grand Canyon, Arizona to Williams as helper engines on passenger trains in what are known as double header operations. Upon arrival at Williams each of these locomotives was "cut off" and then "run light" (engine alone) to Ash Fork by the engineer and fireman, a distance less than twenty-five miles. On both of these occasions the company maintained what is described as a pool or reservoir of helper power at Ash Fork, and the reason for these movements was to get these locomotives into this pool where the power would be needed.

There is no dispute that the engines here involved were helper locomotives when they were being utilized to assist passenger trains between Grand Canyon and Williams. The controversy centers around the status of these locomotives as they were "run light" from Williams to Ash Fork after they had been cut off from actual helper service. It is apparent that if these locomotives qualified as "helper locomotives going or returning a distance of twenty-five (25) miles" no violation of the statute could be established. The crucial question is whether these locomotives in proceeding from Williams to Ash Fork were "returning" from actual helper service. We have held that where a statute is ambiguous in its language it should be construed in view of its purpose and in the light of the evil it was designed to remedy. City of Tucson v. Tucson Sunshine Climate Club, 64 Ariz. 1, 164 P.2d 598; Peterson v. Sundt, 67 Ariz. 312, 195 P.2d 158. It is plain that the underlying purpose of this statute was the promotion of public safety. All parties agree that when a helper locomotive assists a train from Ash Fork to Williams the company is authorized under the statute to run it light back to Ash Fork with a crew consisting of an engineer and fireman; yet, it is contended by the State that when the same helper locomotive assists a train from Grand Canyon to Williams it would be a violation of the statute to "run light"

with such a crew from Williams to Ash Fork on the ground that the engine would not then be "returning" from actual helper service. When viewed in the light of the purpose of the statute, namely, the promotion of public safety, this is equivalent to saying that there is greater risk of public harm when an engine proceeds from Williams to Ash Fork under circumstances where its point of origin is Grand Canyon than. would result if the same engine moved from Williams to Ash Fork after supplying helper service between these latter points. To so conclude would do violence to our sense of reason, and could not have been the result intended by our legislature. Therefore, in consonance with the foregoing analysis, and in keeping with the rules of construction above set forth, we hold that the word "returning", as employed in the statute, is broad enough to authorize the movement of a helper locomotive up to a distance of twenty-five miles in any direction from the point where it ceases to be a helper locomotive engaged in actual helper service. Both of the engines here in controversy had completed runs from Grand Canyon to Williams as helper locomotives assisting passenger trains between these points. Upon arrival at Williams they completed their mission as helper locomotives in actual helper service, and the company was authorized to direct their movement, with a crew consisting of an engineer and fireman, up to twenty-five miles to any point which the company deemed practicable. Therefore, we rule that as a matter of law no violation of the statute was established under the facts of this case.

Judgment affirmed.

UDALL, C. J., and WINDES and STRUCKMEYER, JJ., concur.

PHELPS, Justice.

I concur in the result reached but I believe the pronouncement made in the majority opinion to the effect that:

"* * * the word 'returning', as employed in the statute, is broad enough to authorize the movement of a helper locomotive up to a distance of twenty-five miles in any direction from the point where it ceases to be a helper locomotive engaged in actual helper service. * * *"

is not justified under any interpretation . to which the language used could possibly be susceptible, and I believe it to be a dangerous pronouncement. The statute involved provides that:

"69–121. Train crews—Failure to use full crews—Penalty.—A single locomotive, or a single locomotive with its accompanying tender, *when operated outside of the yard limits,* shall be

equipped with, and shall carry, a crew consisting of not less than one (1) engineer, one (1) fireman, and one (1) conductor or flagman; provided, how ever, that this section shall not apply to helper locomotives *going* or *return-ing* a distance of twenty-five (25) miles." (Emphasis supplied.)

A helper locomotive has a well-defined meaning in railroad vernacular. As testified by the witness Russell

" * * * Well, the best definition I could give for a helper locomotive would be a locomotive that helped or assisted another locomotive in the handling of his train when such assistance was needed. * * *"

Its character is determined by the kind of work it does. As soon as it loses its character as a "helper locomotive" it would have no right, under the law, to proceed beyond the yard limits of the station where it ceased to be a "helper locomotive," without having aboard a crew as prescribed by the statute for such movement, to wit: one engineer, one fireman and one conductor or flagman. Thus, the pronouncement in the majority opinion that after it ceases to be a helper locomotive it may proceed a distance of twenty-five miles in

any direction finds no authority in the statute.

The point I urged upon the majority was that neither of these engines ceased to be engaged in the service as "helper engines" when they were ordered transferred from helper service on the Williams-Grand Canyon branch to helper service on the main line between Williams and Ash Fork.

The statute expressly provides for *going* from Williams to Ash Fork for the purpose of assisting in pulling an eastbound train over the mountain to Williams as much so as it does for its subsequent *return* from Williams to Ash Fork after performing its initial helper service between those points.

In each instance the engine was ordered to continue in the "helper locomotive" service by proceeding to Ash Fork where helper service was required on eastbound trains. The fact that later emergencies may have arisen, requiring the use of one of the engines in the regular transportation of freight or passengers, had no retroactive effect upon its character as a helper locomotive at the time it was ordered from Williams to Ash Fork for helper service.

Judgment affirmed.